# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **AARON SCHEIDIES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:24-cv-01530-AMM** |
| | ) | |
| **MOUNT ROYAL** | ) | |
| **OPERATIONS, LLC d/b/a** | ) | |
| **ELITE NURSING AND** | ) | |
| **REHABILITATION CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case comes before the court on a motion for summary judgment filed by defendant Mount Royal Operations, LLC d/b/a Elite Nursing and Rehabilitation Center ("Elite"). Docs. 61–63. The motion is fully briefed. Docs. 66, 68, 70. For the reasons explained below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

This case involves an employment dispute. These are the material facts construed in the light most favorable to plaintiff Aaron Scheidies:

Mr. Scheidies has a progressive eye condition, Juvenile Macular Degeneration. Doc. 61-1 at 18–20. As a result, Mr. Scheidies is legally blind. *Id.*;

Doc. 66-1 at 2. Because of this blindness, Mr. Scheidies is "unable to read without the assistance of screen reading software, such as ZoomText Magnifier/Reader Software." Doc. 66-2 at 2.

Despite this blindness, Mr. Scheides has worked as a physical therapist. In 2004, Mr. Scheidies obtained his bachelor's degree in kinesiology, and in 2008, he earned his doctorate in physical therapy. Doc. 66-7 at 3; *see also* Doc. 61-1 at 15–17. Since 2009, Mr. Scheidies has worked as a physical therapist at rehabilitation and senior living facilities. *See* Doc. 66-7 at 3–4; *see also* Doc. 61-1 at 46–48. In these previous physical therapist positions, Mr. Scheidies requested and was granted accommodations for his blindness, including assistive software, a laptop that could run the assistive software, an external mouse and keyboard, Microsoft Word access, and a table or desk on which to place his equipment. Doc. 61-1 at 215–16.

Elite is a nursing home, Doc. 66-3 at 8, that serves both skilled care and long-term care patients, *see* Doc. 66-15 at 2–5. Skilled care patients are typically patients who had an acute stay at a hospital and come to Elite for therapy services after the hospital stay. Doc. 66-16 at 10. Long-term care patients are those who reside in a nursing home with no initial plan to be discharged. Doc. 61-18 at 33–34; *see also* Doc. 66-16 at 11. Long-term care patients may need physical therapy services from time to time. Doc. 66-16 at 11; *see also* Doc. 61-18 at 50–52. Elite sometimes refers to long-term care patients as "Part B" patients. Doc. 61-18 at 35.

2

In April 2022 and May 2022, Elite provided physical therapy services to thirteen and fifteen skilled care patients, respectively. *See* Doc. 66-15 at 17. From June 2022 until mid-April 2023, Elite employed a full-time physical therapist named Hayley Gerken. Doc. 66-14 at 6. During Ms. Gerken's time at Elite, Elite provided physical therapy services to eighteen to thirty skilled care patients, depending on the month. Doc. 66-15 at 17.

In the fall of 2023, Elite had a contract with QRM, a company that provided services to Elite, including recruiting physical therapists for Elite. Doc. 66-25 at 2. Stacie Wiechman was the QRM Regional Operations Director assigned to Elite. *See* Doc. 66-16 at 7–8. Ms. Wiechman "help[ed] clients oversee therapy services within their facility." *Id.* at 7. In this role, Ms. Wiechman expressed to Leonjua Yancey, Elite's Director of Rehabilitation, that the long-term care population was underserved—some long-term care residents had never received needed therapy services. Doc. 61-18 at 21–22, 50–52.

Whether there was actually an underserved population is in dispute. *Compare* Doc. 66-3 at 13 (testifying that there was no underserved patient population at Elite), *with* Doc. 61-1 at 154–55, *and* Doc. 61-18 at 50–52 (testifying that Ms. Wiechman informed them that there was an underserved patient population at Elite). Likewise, there is a dispute about whether Elite needed a full-time physical therapist in the fall of 2023. *Compare* Doc. 66-16 at 17–18 (testifying that prior to opening the full-time

physical therapist position in August 2023, Ms. Weichman, along with others, "look[ed] at multiple things to determine if a need was . . . there"), *and* Doc. 61-1 at 154–55, 175 (testimony from Mr. Scheidies that Ms. Yancey and Ms. Weichman informed him of an underserved population and a need for a full-time employee), *with* Doc. 61-18 at 78 (testimony from Ms. Yancey, "I didn't even know if full-time was needed, you know"), *and* Doc. 66-3 at 12 (testimony from Ms. Bell that there was no need for a full-time physical therapist in the fall of 2023).

In August 2023, Ms. Wiechman opened a position for a full-time physical therapist at Elite. Doc. 66-16 at 17. QRM was authorized to extend contingent offers of employment to physical therapists. Doc. 66-14 at 6. The job opening was posted on Indeed. *See generally* Doc. 66-34.

There is a dispute regarding whether Ms. Bell spoke with Ms. Weichman prior to Ms. Wiechman opening a full-time physical therapist position for Elite in August 2023. *Compare* Doc. 66-16 at 17, 23–24 (testifying that she was "pretty sure" she would have consulted with Ms. Bell prior to opening the full-time position but admitting that she did not "definitely recall" a specific conversation with Ms. Bell), *with* Doc. 66-3 at 30 (Ms. Bell testifying that she first learned Elite was hiring a full-time physical therapist on or about October 12, 2023).

But Elite explained that "QRM controlled everything involved in therapist hiring up to [the] point of [Elite's Director of Human Resources] obtaining an

employment application for informational purposes, after QRM communicates that it has made an offer, and then she conducts background checks." Doc. 66-14 at 6–7; *see also id.* at 6 ("Defendant believes that at some point earlier in 2023, a prior Rehabilitation Manager requested QRM to find a full-time physical therapist.").

On September 18, 2023, Mr. Scheidies responded to the Indeed post about a full-time physical therapist position. *See* Doc. 66-34. When Mr. Scheidies applied for the position, he had over fourteen years of experience as a physical therapist. *See* Doc. 66-7 at 3–4.

Two days after Mr. Scheidies applied for the position, Mr. Scheidies had a phone interview with Ms. Wiechman. *See* Doc. 61-1 at 153–54; Doc. 66-35 at 2; Doc. 66-16 at 20. According to Mr. Scheidies, during this phone interview, Ms. Wiechman indicated that Elite needed a full-time physical therapist and had a large underserved long-term care population. Doc. 61-1 at 154–55. Following the interview, Ms. Wiechman concluded that Mr. Scheidies "met the qualifications" for the physical therapist position. Doc. 66-16 at 20.

On September 22, 2023, two days after his interview, Mr. Scheidies toured Elite's facility with Elizabeth Osbourne, the Assistant Rehabilitation Director at Elite. *See* Doc. 66-6 at 2–4; Doc. 66-1 at 157–60. After this tour, Ms. Osbourne was asked whether Mr. Scheidies would be a good fit, and Ms. Osbourne replied, "Our only concern is that he seems to be interested in treating skilled over LT and we are

really trying to grow our part B caseload. As long as he understands that, we think he would be a great fit!" Doc. 66-6 at 2. Tisha Bell, Elite's Administrator, Doc. 66-3 at 8, and Donta Williams-Lyles, Elite's Director of Human Resources, Doc. 61-30 at 13–14, were copied on Ms. Osbourne's estimation of Mr. Scheidies. Doc. 66-6 at 2.

Three days later, Laura Benoit with QRM sent Mr. Scheidies a text message stating that Elite would like to make Mr. Scheidies an offer. Doc. 66-35 at 3. Ms. Benoit later extended Mr. Scheidies a verbal offer of employment as a full-time physical therapist at Elite. Doc. 66-44 at 3.

Shortly after, Mr. Scheidies had an onsite meeting with Elite's Director of Rehabilitation, Ms. Yancey. Doc. 66-25 at 3. Ms. Yancey explained that as a physical therapist at Elite, Mr. Scheidies would be providing "a lot of long-term care." Doc. 61-18 at 79–80. According to Mr. Scheidies, Ms. Yancey also explained that Elite had "over thirty underserved long-term care patients" and "may even need to hire another person." Doc. 61-1 at 175. Based on this meeting, Ms. Yancey concluded that Mr. Scheides was qualified to be Elite's physical therapist. Doc. 61-18 at 119.

On October 4, 2023, just after Mr. Scheidies's onsite meeting, Ms. Benoit emailed Ms. Bell and Ms. Williams-Lyles, informing them that Mr. Scheidies had accepted the full-time physical therapist position. Doc. 66-7 at 2. Ms. Williams-

6

Lyles emailed Mr. Scheidies that day and stated, "We are excited about your decision to join our Rehab team here at Elite." Doc. 66-8 at 2. She copied Ms. Benoit, Ms. Bell, and Ms. Yancey on this email. *Id.* In this email, Ms. Williams-Lyles instructed Mr. Scheidies about the formal application process and the upcoming background check, and she also explained that Elite had two orientations scheduled, and Mr. Scheidies needed to select which to attend. *Id.*

Two days later, Ms. Williams-Lyles emailed Mr. Scheides to thank him for "submitting [his] application and all requested documents" and to inform him that she would reach out once Elite "made a final decision." Doc. 61-43 at 2. Ms. Yancey, Ms. Bell, and Ms. Benoit were copied on this email as well. *Id.* On October 10, 2023, Ms. Williams-Lyles sent Mr. Scheidies a text message, stating, "Elite Nursing and Rehab welcomes you to our TEAM. New hire orientation will begin on Monday, October 16 at 9:45 am." Doc. 61-44 at 1.

Despite this, there is a dispute about whether Mr. Scheidies—who was scheduled to attend orientation on October 16, 2023—was hired as a full-time physical therapist at Elite. *Compare* Doc. 61-18 at 94 (Ms. Yancey explaining, "I would think that when you go to an orientation that you're hired" and that in "the therapy department, the first day of orientation is the first day of work"), *with* Doc. 61-30 at 16–17 (claiming that a person is "not hired until they actually come to orientation and complete and pass the . . . drug screen for one, and the COVID test").

Ms. Yancey explained that in her experience, offering a physical therapist an opportunity to attend orientation indicates a belief that he is qualified to perform the essential functions of the position. Doc. 61-18 at 110. She also stated that "by the time that [they] got to [her] meeting on the 29th [with Mr. Scheidies] he had an offer, which made [her] feel like he was hired." *Id.* at 81.

Two days after the welcome text message, and four days before orientation was set to begin, Mr. Scheidies emailed Ms. Williams-Lyles to explain that he is legally blind and required certain accommodations "to perform duties of the job at Elite Nursing and Rehab." Doc. 61-45 at 1. Specifically, Mr. Scheidies requested the same accommodations that he had received from previous employers: ZoomText software, a laptop, an external mouse and keyboard, Microsoft Word access, and a table or desk on which to place his equipment. *Id.*; *see* Doc. 61-1 at 215–16. He also informed Ms. Williams-Lyles that he would bring other items that assisted him in performing his job. Doc. 61-45 at 1. But he emphasized that he could "perform the [physical therapist] job as [he had] for the past 14 years given the correct accommodations." *Id.* Mr. Scheidies concluded that "[t]his stuff shouldn't really need to be done by the Monday onboarding day as I won't be treating patients and using the EMR etc." *Id.*

That same day, Ms. Williams-Lyles emailed two individuals explaining, "We have a PT that is scheduled to begin on Monday (10/16) that will need the listed

accommodations. The accommodations are reasonable and doable but the software purchase would need to be approved by you." Doc. 66-12 at 2. Ms. Bell was copied on this email. *Id.*

The next day, October 13, 2023, at 1:58 pm, Ms. Williams-Lyles told Mr. Scheidies that Elite wanted Mr. Scheidies to attend the orientation on October 16, 2023, but they "may not have all the accommodations in place." Doc. 61-45 at 1–2. Ms. Bell, Ms. Benoit, and Ms. Yancey were copied on this email. *Id.*

Later that day—the day after Mr. Scheidies disclosed his disability and accommodation needs and shortly after he received Ms. Williams-Lyles's email, a QRM employee named Wendi Finley called him to "rescind the [job] offer on behalf of Elite." Doc. 66-26 at 7. Ms. Bell, as Elite's Administrator, testified that she made the decision to rescind the job offer and that she did not believe that Elite needed a full-time physical therapist at the time. *See* Doc. 66-3 at 12, 31. According to Ms. Bell, her belief about Elite's needs was based on how many patients were receiving "skilled services" and that hiring a full-time physical therapist wasn't warranted until a facility consistently had "somewhere around 28 skilled residents or more." *Id.* at 12–13.

Ms. Yancey, as Elite's Director of Rehabilitation, never received any indication that Elite was not moving forward with hiring Mr. Scheidies prior to October 13, 2023. Doc. 61-18 at 104. And Ms. Williams-Lyles recalled only four

9

job-offer recissions ever by Elite—one being Mr. Scheidies's recission and the other three relating to COVID-19 complications. Doc. 61-30 at 26–27.

In November 2023, Elite hired three physical therapists on an as-needed basis. Doc. 66-14 at 4–5; Doc. 66-3 at 13 (explaining that PRN means "as needed"). Elite hired two more as-needed physical therapists shortly thereafter—one in December 2023 and another in March 2024. Doc. 66-14 at 4–5. None of these as-needed physical therapists had a disability or needed accommodations. Doc. 61-30 at 57–58, 60–62. Elite did not hire any full-time physical therapist after Mr. Scheidies's offer was rescinded. Doc. 61-18 at 114; Doc. 61-30 at 157–58.

On January 17, 2024, three months after Mr. Scheidies's job offer was rescinded, Ms. Wiechman instructed another QRM employee "to change the posting for Elite PT from fulltime to part-time." Doc. 66-46 at 2. The QRM employee wrote in QRM's database, "Hired Aaron Spedesis (?) but offer[] rescinded due to disability." Doc. 66-47 at 2; *see also* Doc. 66-45 at 8–9.

Mr. Scheidies filed a complaint against Elite, alleging two counts: (1) violation of Title 1 of the Americans with Disabilities Act for failure to hire, and (2) violation of Title 1 of the Americans with Disabilities Act for failure to accommodate. Doc. 1 at 8–11. Elite moved for summary judgment, Docs. 61–63, and the motion is fully briefed, Docs. 66, 68, 70.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324–25; *see also* Fed. R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id*.

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential

11

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

## III.    DISCUSSION

### A. Discrimination Claim

"[T]he ADA prohibits a broad variety of adverse employment actions, whenever those actions are taken for a prohibited reason." *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1447 (11th Cir. 1998) (cleaned up). Under the ADA, "no covered employer may use the disability of an otherwise qualified person as an excuse for discrimination in hiring, promotion, discharge, compensation, training, or other terms, conditions, and privileges of employment." *Id*. (cleaned up); *see also* 42 U.S.C. § 12112(a).

To "survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in [his] favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019). A plaintiff can do this in three ways: (1) "by satisfying the burden-shifting framework set out in *McDonnell*

*Douglas*," *id.*, (2) by "present[ing] direct evidence of discriminatory intent," *id.* n.6, or (3) by "demonstrat[ing] a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination," *id.* (cleaned up).

Mr. Scheidies contends that he has provided direct evidence of discrimination through the QRM employee's notation that the offer was rescinded due to discrimination. *See* Doc. 68 at 26–27. Elite contends that this notation is "inadmissible rank speculation by someone unrelated to the challenged employment decision." Doc. 70 at 1. Because the court decides that Mr. Scheidies has provided sufficient circumstantial evidence to defeat summary judgment, as explained below, the court need not address this dispute.

"When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination . . . ." *Lewis*, 918 F.3d at 1220–21. "If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221. "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Id.* (cleaned up).

Elite principally argues that "[Mr.] Scheidies cannot establish a *prima facie* case of disability discrimination based on the recission of the full-time job offer . . . ."[1] Doc. 63 at 9. According to Elite, this is "due to the lack of evidence Elite hired anyone, much less any non-disabled individual, as a full-time physical therapist, or kept the full-time position open seeking full-time physical therapist applicants." *Id.* According to Elite, this is one of the elements of Mr. Scheidies's *prima facie* case. *Id.* at 9–11. Elite cites several Eleventh Circuit cases for this proposition. *See id.* at 9–10.

Elite misunderstands an important distinction between Title VII of the Civil Rights Act of 1964 and the ADA. The cases that Elite cites establish that a *prima facie* failure-to-hire case under Title VII requires the plaintiff to demonstrate that: "(1) [he] was a member of a protected class; (2) [he] applied and was qualified for a position for which the employer was accepting applications; (3) despite [his] qualifications, [he] was not hired; and (4) the position remained open or was filled by another person outside of [his] protected class." *See, e.g.*, *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002). But the cases that Elite cites do not address what is required for a *prima facie* case under the ADA.

---

[1] "For purposes of summary judgment, Elite does not contest that [Mr.] Scheidies satisfies the other elements [of the *prima facie* case] because he applied for a full-time physical therapist position, was qualified for the full-time position, and was not hired for the full-time position he sought." Doc. 63 at 9 n.10. Accordingly, the court will not address whether Mr. Scheidies satisfies the other elements.

Rather, "[a] plaintiff advancing a claim of employment discrimination under the ADA must make a prima facie case establishing that (1) he has a disability, (2) he is a qualified individual, . . . and (3) the defendant unlawfully discriminated against him because of the disability." *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000) (cleaned up).

Mr. Scheidies contends that even if he were required to show that Elite kept the position open or filled it with a non-disabled person, "the evidence reveals that the full-time physical therapist position remained open until January 2024, three months after Mr. Scheidies'[s] job offer was rescinded." Doc. 68 at 31. And, "while Elite did not hire a non-disabled full-time physical therapist, it did hire five non-disabled [as-needed] physical therapists, all without offering Mr. Scheidies the position." *Id.* (emphasis removed). So, according to Mr. Scheidies, he "has satisfied the third element of a *prima facie* case." *Id.*

Mr. Scheidies also contends that Elite has not proffered a legitimate, non-pretextual reason for rescinding the job offer. *See id.* at 32 ("Elite presents no allegedly legitimate reason for its actions . . . . Elite's analysis begins and ends with whether Mr. Scheidies can establish a failure-to-hire *prima facie* case."). Mr. Scheidies does acknowledge, however, that "[t]hough failing to make any representations regarding any allegedly legitimate reason for rescinding Mr. Scheidies'[s] job offer in its Motion, throughout this litigation, Elite has claimed that

it rescinded Mr. Scheidies'[s] job offer because it did not need a full-time physical therapist at the time he applied . . . ." *Id.* at 33. Mr. Scheidies proceeds as if Elite has sufficiently proffered an allegedly legitimate reason. *See id.* at 33–37. According to Mr. Scheidies, this reason is pretext for discrimination. *Id.* at 32–37.

The record does not clearly support Mr. Scheidies's conclusion that Elite's reason is pretextual. Mr. Scheidies's "statement of disputed facts" begins with, "There is a dispute regarding whether Elite needed a full-time physical therapist in the Fall of 2023." *Id.* at 20. He proceeds, "There is a dispute regarding whether there was an underserved long-term care population at Elite in the Fall of 2023." *Id.* Accordingly, the veracity of Elite's proffered legitimate, non-discriminatory reason is disputed.

Though the court is not persuaded that Elite's proffered reason is pretext, Mr. Scheidies's circumstantial evidence is sufficient to defeat summary judgment. The Eleventh Circuit recently explained district courts' improper use of *McDonnell Douglas* as "the only game in town." *Ismael v. Roundtree*, 161 F.4th 752, 763 (11th Cir. Dec. 5, 2025). The Eleventh Circuit cautioned that "[i]f [courts] require the plaintiff to negate their counterparty's rationale, [courts] permit the absurd result of a plaintiff losing on summary judgment for failing to demonstrate a falsity that [he] would not need to show at trial." *Id.* at 761. "[T]he entire evidentiary picture goes further than pretext." *Id.* at 762 (cleaned up). Pretext is only "*a subset* of potentially

relevant circumstantial evidence." *Id.* Accordingly, "summary judgment should not be granted for failure to demonstrate pretext unless it also reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination." *Id.* at 763 (cleaned up).

The Eleventh Circuit provided a "roadmap" "for district courts to properly review summary judgment motions." *Id.* at 764. "If the plaintiff can establish a prima facie case, [he] is entitled to a rebuttable presumption of illicit intent. This necessarily means that if the defendant fails to proffer evidence of a legitimate reason for the adverse employment action, summary judgment in favor of the plaintiff is appropriate." *Id.* "Or, if only the defendant has moved for summary judgment, the court must reject that motion." *Id.* n.5. "Where, as is more common, the defendant comes forth with evidence and successfully rebuts the presumption, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *Id.* at 764 (cleaned up). "It simply drops out of the picture." *Id.* (cleaned up). "At this point, the court must proceed to ask whether the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination . . . by the decisionmaker." *Id.* (cleaned up). "A showing of pretext (or lack thereof) would certainly be relevant. But a plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment." *Id.* And a plaintiff's "evidence does not need to

attack—or even have anything to do with—the defendant's purported rationale to help raise an inference of discrimination." *Id.* Instead, courts "should ask whether [a plaintiff's] circumstantial evidence, when artfully adhered together and viewed as one, allows a reasonable juror to envision an image of [discrimination] and find in [the plaintiff's] favor." *Id.*

This is where the court finds itself now. Even if the court were to allow Elite's assertions "throughout this litigation" to count as an allegedly legitimate reason that Mr. Scheidies has not shown is pretext, Mr. Scheidies has sufficiently presented a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *See id.* The Eleventh Circuit has explained that such evidence may include, among other things, "suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* at 760 (cleaned up).

"Here, Elite rescinded Mr. Scheidies'[s] job offer *one day* after he disclosed his disability and the accommodations he needed." Doc. 68 at 29. Ms. Bell—the Elite employee who eventually decided to rescind the offer—was copied on all emails regarding Mr. Scheidies's hiring and never objected to his employment, until Mr. Scheidies disclosed his disability.[2] *See* Doc. 66-7 at 2; Doc. 66-3 at 12–13. Elite

---

[2] There is a dispute regarding when Ms. Bell first became aware of Mr. Scheidies's hiring. *Compare* Doc. 66-3 at 30 (testifying that she first learned on or about October 12, 2023, that Elite was hiring a full-time physical therapist), *with* Doc. 66-7 at 2

employees expressed excitement about Mr. Scheidies's employment and welcomed him to the team—until he told them about his disability. When he told them about his disability, they rescinded the offer the next day. As far as the record reflects, nothing had changed except the revelation of Mr. Scheidies's disability. Accordingly, the record reflects a convincing mosaic of circumstantial evidence that could allow a jury to infer intentional discrimination. The court **DENIES** Elite's motion for summary judgment as to Count I.

### B. Failure to Accommodate

Mr. Scheidies also contends that "a reasonable jury could find that Mr. Scheidies has satisfied the elements of a failure-to-accommodate claim." Doc. 68 at 39. Elite argues that "[b]ecause Elite did not hire [Mr.] Scheidies, and he never started working, there was no need for accommodations to enable him to actually perform job duties." Doc. 63 at 9. According to Mr. Scheidies, "given that Mr. Scheidies completed all necessary paperwork and was invited to attend orientation, a reasonable jury could find that Elite initially hired Mr. Scheidies," and "Elite would have been obligated to provide Mr. Scheidies'[s] requested accommodations." Doc. 68 at 40.

---

(demonstrating that Ms. Bell was received emails relating to Mr. Scheidies's hiring as early as October 4, 2023). Because at this stage, the court must construe inferences in favor of the nonmovant, Mr. Scheidies, the court will assume that Ms. Bell was aware of the emails before October 12, 2023, regarding Mr. Scheidies's employment.

"[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is otherwise qualified, and unless the employer can show undue hardship." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) (cleaned up). "An accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). "[D]iscrimination in the form of a failure to reasonably accommodate is actionable under the ADA only if that failure negatively impacts the employee's hiring, advancement, discharge, compensation, training, and other terms, conditions, and privileges of his employment." *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023).

According to Mr. Scheidies, he has satisfied this standard. Mr. Scheidies contends that "Elite was unwilling to accommodate Mr. Scheidies, and . . . this unwillingness (i.e., failure) to accommodate him negatively impacted Elite's decision to hire him." Doc. 68 at 39 (cleaned up). Elite does not appear to dispute that the accommodations that Mr. Scheidies requested were reasonable or that he would have been able to complete the essential functions of his job with them, as he had done for fourteen years with other employers. *See* Doc. 63. Nor does Elite ever assert that providing an accommodation would have imposed any kind of hardship on Elite. *See id.* Rather, Elite contends that "[Mr. Scheidies] did not ask for any

accommodations potentially necessary to apply or participate in the hiring process itself. Rather, he only requested accommodations he said were necessary if he actually started treating patients, which never occurred because he never began working at Elite." *Id.* at 1. According to Elite, Mr. Scheidies's "failure to accommodate claim . . . rests exclusively on a theory that the refusal to hire is the same as a refusal to accommodate." *Id.* at 11.

Mr. Scheidies, however, cites no binding authority, and this court is aware of none, that failing to hire an applicant can serve as the basis for an ADA failure-to-accommodate claim. Mr. Scheidies cites to precedent that "[a]n employer who has actual knowledge of the need for an accommodation does not violate Title VII by refusing to hire an applicant if avoiding that accommodation is not his *motive*. Conversely, an employer who acts with the motive of avoiding accommodation may violate Title VII . . . ." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015). But the Supreme Court made this observation just after noting a "significant" difference between the ADA and Title VII. *Id.* (noting that Title VII "does not impose a knowledge requirement," unlike the ADA).

Further, Mr. Scheidies contends that "courts permit plaintiffs to pursue failure-to-accommodate claims when, as here, there is an allegation of a discriminatory failure to hire." Doc. 68 at 40. For this, he cites an unpublished Middle District of Alabama case. *Id.* (citing *Helmuth v. Troy Univ.*, No. 2:19-CV-

21

601-RAH-SMD, 2021 WL 1081118 (M.D. Ala. Mar. 19, 2021)). In *Helmuth*, the defendant did not move for summary judgment as to the failure-to-accommodate claim, so the court "[could not] adjudicate it on the merits at th[at] juncture." *Helmuth*, 2021 WL 1081118, at 13. Accordingly, that does not establish that a plaintiff can successfully claim failure-to-accommodate under the ADA by alleging discriminatory failure to hire. Even if it did, it is not binding authority on this court.

As Elite explains, "[Mr. Scheidies] did not ask for any accommodations potentially necessary to apply or participate in the hiring process itself. Rather, he only requested accommodations he said were necessary if he actually started treating patients . . . ." Doc. 63 at 1. Mr. Scheidies even told Elite that "[the accommodations] shouldn't really need to be done by the Monday onboarding day as [he] [wouldn't] be treating patients . . . ." *Id.* at 3. So the record reflects that Mr. Scheidies's only request for accommodations related to the day he began treating patients—a day that never came because his job offer was rescinded. Because Mr. Scheidies points to no authority for bringing an ADA failure-to-accommodate claim on allegations of discriminatory failure to hire, the court **GRANTS** Elite's motion for summary judgment as to Count II.

## IV.    CONCLUSION

For the reasons explained above, Elite's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**DONE** and **ORDERED** this 14th day of January, 2026.


_____

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE